IN THE COURT OF APPEALS OF TENNESSEE
AT MEMPHIS
January 23, 2008 Session

## MATTHEW THORNTON, ET AL. v. ALLENBROOKE NURSING AND REHABILITATION CENTER, LLC, ET AL.

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-006784-05      James Russell, Judge**

_____

**No. W2007-00950-COA-R3-CV  - Filed July 3, 2008**

_____

This appeal involves a dispute over an arbitration agreement, and stems from a nursing home abuse and neglect case.  The decedent's daughter signed all the paperwork associated with the decedent's admission to the nursing home.  An arbitration agreement was included in the admissions agreement.  Decedent's daughter, as next of kin, filed a complaint alleging nursing home abuse and neglect.  The nursing home moved to stay the case and compel the matter to arbitration.  The trial court held that daughter did not have authority to waive decedent's constitutional right to a jury trial, and denied the nursing home's motion.  The nursing home appeals.  We affirm the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Affirmed; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which Alan E. Highers, P.J., W.S., joined.  W. FRANK CRAWFORD, J., not participating.

Rebecca Adelman and Chase Pittman, Memphis, Tennessee, for the appellant, Allenbrooke Nursing and Rehabilitation Center, LLC, Allenbrooke Health Care Center, Allenbrooke Health Care Center d/b/a Beverly Enterprises, Tennessee, Inc. And Beverly Enterprises Tennessee, Inc.

Peter B. Gee, Jr., Memphis, Tennessee and Brian G. Brooks, Greenbrier, Arkansas, for the appellee, Matthew Thornton, Probate Estate Administrator.

### OPINION

#### Facts and Procedural History

In December of 2004, Ira Lee Jones (hereinafter, the "Decedent") was admitted into the Allenbrooke Nursing and Rehabilitation Center (hereinafter, "Nursing Home".  On December 15, 2004, her daughter, Patricia Raybon, (hereinafter, the "Daughter"), met with Christopher Wells (hereinafter, "Mr. Wells"), the admissions and sales representative at Nursing Home.  During the

meeting, Daughter signed several documents for her mother's admission, including an Admission Agreement and an Arbitration Agreement.

The Arbitration Agreement begins on page 29 of the 34 page Admission Agreement, and is designated as EXHIBIT B, with the following title centered underneath the heading: **RESIDENT AND FACILITY ARBITRATION AGREEMENT** (emphasis in original). The two (2) page document provides:

This ARBITRATION AGREEMENT ("Agreement") is executed by _____ (the "Facility") and _____[1] ("Resident") or "Resident's Designated Representative", hereafter collectively referred to as ("Resident") in conjunction with the agreement for admission and for the provision of nursing facility services (the "Admission Agreement") by the Facility to the Resident. The parties to this Agreement acknowledge and agree that upon execution, this Agreement becomes part of the Admission Agreement, and that the Admission Agreement evidences a transaction in interstate commerce governed by the Federal Arbitration Act. It is understood and agreed by the Facility and the Resident that any and all claims, disputes, and controversies (hereafter collectively referred to as a "claim" or collectively as "claims") arising out of, or in connection with, or relating in any way to the Admission Agreement or any service or health care provided by the Facility to the Resident shall be resolved exclusively by binding arbitration to be conducted at a place agreed upon by the Parties, or in the absence of such an agreement, at the Facility, in accordance with the National Arbitration Forum Code of Procedure, which is hereby incorporated into this Agreement. This Agreement shall be governed by and interpreted under the Federal Arbitration Act, 9 U.S.C. Section 1-16.

This Agreement to arbitrate includes, without limitation, or refund for services rendered to the Resident by the Facility, violations of any right granted to the Resident by law or by the Admission Agreement, breach of contract, fraud or misrepresentation, negligence, gross negligence, malpractice, or claims based on any departure from accepted medical or health care or safety standards, as well as any and all claims for equitable relief or claims based on contract, tort, statute, warranty, or any alleged breach, default, negligence, fraud**,** misrepresentation, suppression of fact, or inducement. However, this Agreement shall not limit the Resident's right to file a grievance or complaint with the Facility.

The parties agree that damages awarded, if any, in an arbitration conducted pursuant to this Agreement shall be determined in accordance with the provisions of the state or federal law applicable to a comparable civil action, including any prerequisites to, credit against, or limitations on, such damages. Any award of the

---

[1]The name "Ira Jones" had been handwritten on the two blank lines designated for the Facility and the Resident

arbitrator(s) may be entered as a judgment in any court having jurisdiction. In the event a court having jurisdiction finds any portion of this Agreement unenforceable, that portion shall not be effective and the remainder of the Agreement shall remain effective.

## RESIDENT AND FACILITY ARBITRATION AGREEMENT

It is the intention of the parties to this Agreement that it shall inure to the benefit of and bind the parties, their successors, and assigns, including without limitation the agents, employees and servants of the Facility, and all persons whose claim is derived through or on behalf of the Resident, including any parent, spouse, sibling, child guardian, executor, legal representative, administrator, or heir of the Resident. The parties further intend that this Agreement is to survive the lives or existence of the parties hereto.

All claims based in whole or in part on the same incident, transaction, or related course of care or services provided by the Facility to the Resident shall be arbitrated in one proceeding. A claim shall be waived and forever barred if it arose and should reasonably have been discovered prior to the date upon which notice of arbitration is given to the Facility or received by the Resident and such claim is not presented in the arbitration proceeding.

The parties understand and agree that this contract contains a binding arbitration provision which may be enforced by the parties, and that by entering into this arbitration agreement, the parties are giving up and waiving their constitutional right to have any claim decided in a court of law before a judge and a jury, as well as any appeal from a decision or award of damages.

The Resident understands that: (a) he/she has the right to seek legal counsel concerning this Arbitration Agreement; (b) execution of this Agreement is not a precondition to admission or to the furnishing of services to the Resident by the Facility; and (c) this Agreement may be rescinded by written notice to the Facility from the Resident within thirty days of signature. If not rescinded within thirty days, this Agreement shall remain in effect for all subsequent stays at the Facility, even if the Resident is discharged from and readmitted to the Facility.

The undersigned certifies that he/she read this Agreement, that it has been fully explained to him/her, that he/she understands its contents, that he/she has received a copy of the provision and that he/she is the Resident, or a person duly authorized by the Resident or otherwise to execute this Agreement and accept its terms.

The second page of the Arbitration Agreement is dated December 15, 2004, and bears the signature of Patricia Rayborn, as the Designated Representative, and Christopher T. Wells, as the Facility's Authorized Representative. The signatory line for the Resident is blank. After Daughter signed the Admission Agreement, Decedent was admitted to Nursing Home and was under the Nursing Home's care until she died in February of 2006.

On December 28, 2005, while Decedent was still living, Daughter, as her mother's personal representative, filed a Complaint against the Nursing Home, as well as Allenbrooke Health Care Center, Allenbrooke Health Care Center d/b/a/ Beverly Enterprises Tennessee, Inc., and Beverly Enterprises Tennessee, Inc.[2] The Complaint alleges that Decedent suffered multiple injuries which were the result of Nursing Home's neglectful and deficient course of care.

In response to the Complaint, Nursing Home filed a Motion to Compel Arbitration, based upon the Arbitration Agreement that Daughter signed. Discovery relating to the Arbitration Agreement ensued, and Daughter, Mr. Wells, and Elayne Poston, Mr. Wells' direct supervisor at all times relevant to the instant case, were deposed. During the course of the litigation, Decedent passed away, and Matthew Thornton, as the probate estate administrator, was substituted for Daughter (hereinafter, the "Decedent's Estate").

On December 8, 2006, the trial court heard Nursing Home's Motion to Compel Arbitration, and entertained oral argument from all parties. At the conclusion of the hearing, the trial court denied Nursing Home's Motion, stating that Daughter lacked the requisite authority to waive her mother's right to access the courts and a trial by jury. At the hearing the trial judge stated that:

> In this instance, we know that Ira Jones is the person who owns the cause of action, either for damages or for death. By definition, she is the party to be charged under these circumstances because she is the party truly against whom the enforcement is sought.
>
> Here, of course, we know the true party against whom enforcement is sought, meaning Ira Jones, did not sign this agreement. And we know that Patricia Raybon had no power of attorney. We know that she was not a court-appointed guardian or conservator.
>
> In other words, we know that she was not a person, quote, lawfully authorized, end quote, by her mother, Ira Jones, to sign any legally binding document on her behalf.
>
> The Court is compelled to a conclusion that there is no contract whatsoever to compel arbitration.

---

[2] For ease of reference, we will refer to Nursing Home as it if were the sole defendant. The identity of the other defendants is not critical to the resolution of this appeal.

It would seem to the Court parenthetically that the facility and/or its administrator would have some added responsibility, once it is made known that the person before whom - - or with whom they are dealing has no legal authority, that they make some - - that they make sure that the person who signs is, in fact, either a lawful agent or that there is some incapacity before you can carry the inquiry further.

In fact, here, as pointed out by the Court in some detail, the admissions intake person did not even make sure that this daughter signed in the proper place in some instances. That should end the inquiry and be a sufficient basis upon which to deny the motion, but we'll go further.

. . . .

Here, Ms. Raybon, in her affidavit and in her deposition testimony, says, in essence, that her mother was possessed of all of her faculties and was perfectly capable of reading, understanding, and signing all these documents, including the arbitration contract and its concomitant waiver of the right to a jury trial for herself. The nursing home has pointed to no evidence to the contrary.

Moreover, once aware that Patricia Raybon did not have the power of attorney, Christopher Wells, on behalf of the nursing home, did nothing toward making any determination at all as to Ms. Jones competence or lack of it, if you will, and made no effort whatsoever to have her execute the documents for herself.

With all due respect and in candid response during oral argument, counsel for the nursing home asserts that the process that was followed in this case was business as usual, if you will, and asserts that the way this was done was the way that they have always done it at this particular nursing home, not only by this particular nursing home, but by others as well; and not only that, by nursing homes here and in other jurisdictions as well.

Turning next to the question of so-called detrimental reliance, which is one of the elements of apparent authority, the nursing home has established that it relied upon the authority that would be apparent to its detriment.

The trouble there is, the nursing home can point to no detriment, if you will, that it has suffered by reliance upon the authority that it claims Ms. Raybon had.

The nursing home has conceded that all payments that were due to the nursing home in exchange for the services rendered were made. It lost no money.

At best, the nursing home can only point to detriment, if you will, as being the cost and expense of litigating the issue of whether or not this case should go to arbitration. Quite frankly, that is not this Court's understanding of the term "detrimental reliance" in this context.

All things considered, the Court is compelled to a complete conclusion that the motion to compel arbitration in this case should be denied, and it will be. . . .

On January 19, 2007, the trial judge issued an Order Denying Defendant Allenbrooke's Motion to Compel Arbitration, and incorporated, by reference, the complete transcript of the December 8, 2006 hearing.

From that order, Defendants appeal.

### Issues

As stated in their brief, the Defendants/Appellants raise the following issue:

1. Did the Trial Court err in denying Appellant's Motion to Compel Arbitration, which was predicated upon an Arbitration Agreement that Patricia Raybon, a daughter of Ira Lee Jones, signed for her mother in connection with her mother's admission to Appellant's nursing home?

Decedent's Estate raises the following three (3) issues:

1. Whether a daughter with no documented authority whatsoever may waive he[r] mother's constitutional right to access to the courts and a trial by jury.

2. Whether Defendants breached their fiduciary duties to the nursing-home resident by enticing her daughter to execute an arbitration clause.

3. Whether enforcement of the arbitration clause in this case is unconscionable.

### Standard of Review

When ruling on the appeal of a denial of a motion to compel arbitration, we follow the standard of review that applies to bench trials. *Spann v. Am. Express Travel Related Services Co.*, 224 S.W.3d 698, 706-07 (Tenn. Ct. App. 2006). Accordingly, our review of the trial court's findings of fact are "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). Questions of law are likewise reviewed de novo without a presumption of correctness. *Johnson v. Johnson*, 37 S.W.3d 892, 894 (Tenn. 2001).

*Discussion*

The main issue on appeal is whether the trial court erred in denying Nursing Home's motion to compel arbitration. On appeal, Nursing Home makes several arguments: 1) that because the Arbitration Agreement selects the Federal Arbitration Act (hereinafter, "FAA") as the governing body of law, the trial court should have applied the FAA, which presumes that the arbitration provision is valid and enforceable; 2) that Daughter had actual and apparent authority to contract with Nursing Home, thereby binding Decedent to the Arbitration Agreement; 3) that, by her inaction, Decedent ratified the contracts signed by Daughter; and 4) that Decedent must be estopped from challenging the Arbitration Agreement because she manifested assent to Daughter's contracting on her behalf.

Decedent's Estate contends that 1) Daughter lacked any type of authority to waive her mother's right to a jury trial; 2) Daughter informed Nursing Home that she did not possess a "Power of Authority" for her mother's matters, 3) Decedent did not ratify Daughter's signing away Decedent's right to a jury trial; and 4) Nursing Home breached its fiduciary duty by including the Arbitration Agreement in the Admissions Agreement paperwork.

## *The Federal Arbitration Act's Applicability*

As an initial matter, we address the preemptory power of the FAA. Citing *Flanary v. Carl Gregory Dodge of Johnson City, LLC*, Nursing Home first argues that, because the Arbitration Agreement states that the parties agree to be governed by the FAA, this Court should honor the selection as binding. *Flanary v. Carl Gregory Dodge of Johnson City, LLC*, No. E2004-00620-COA-R3CV, 2005 WL 1277850, at *4 (Tenn. Ct. App. May 31, 2005), *perm. app. denied* (Tenn. Dec. 5, 2005). We agree with Nursing Home that *if* the contract is valid and enforceable, that the forum selection clause is binding.[3] However, first we must determine whether the Decedent is, indeed, bound to the Arbitration Agreement. Accordingly, we turn to a discussion of agency law.

## *Actual and Apparent Authority*

In Tennessee, a putative agent's authority consists of actual or apparent authority. *Miliken Group, Inc. v. Hays Nissan, Inc.,* 86 S.W.3d 564, 567 (Tenn. Ct. App. 2001). As stated in American Jurisprudence, "[t]he relationship between an agent and a principal is a contractual

---

[3] Our holding here does not deviate from the holding in *Owens v. National Health Corp*, - - - S.W.3d - - -, 2007 WL 3284669 (Tenn. 2007). In *Owens*, the Arbitration Agreement expressly provided that "'this agreement for binding arbitration shall be governed by and interpreted in accordance with the law of the state where the Center is licensed.'" *Id.* at *5. Here, the Arbitration Agreement had no such provision. Rather, it provided that "[t]his Agreement shall be governed by and interpreted under the Federal Arbitration Act, 9 U.S.C. Section 1-16." Accordingly, if the Arbitration Agreement in this case was enforceable, federal law would apply.

one. . . As between the parties to the relationship, there must be a meeting of the minds in establishing the agency, and the consent of both the principal and the agent is necessary to create the agency." 3 Am. Jur. 2d Agency § 15 (2007). For an agency relationship to arise, the "principal must intend the agent to act for him or her, the agent must intend to accept the authority and act on it, and the intention of the parties must find expression either in words or conduct between them." *Id.* Further, an agency relationship is only created "at the will and by the act of the principal, and its existence is a fact to be proved by tracing it to some act of the alleged principal, and turns on facts concerning the understanding between the alleged principal and agent." *Id.*

The doctrine of apparent authority has been consistently defined as follows:

> (1) such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing;
> (2) such authority as he appears to have by reason of the actual authority which he has;
> (3) such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess.

*Franklin Distrib. Co., Inc. v. Crush Intern. (U.S.A.), Inc.*, 726 S.W.2d 926, 930-31 (Tenn. Ct. App. 1986) (citing *Southern Ry. Co. v. Pickle,* 197 S.W. 675, 677 (Tenn. 1917); *V.L. Nicholson Co. v. Transcon Inv. and Fin. Ltd., Inc.,* 595 S.W.2d 474, 483 (Tenn. 1980), *Rich Printing Co. v. McKellar's Estate,* 46 Tenn. App. 444, 330 S.W.2d 361, 376 (1959); *Rural Educ. Ass'n v. Bush,* 42 Tenn. App. 34, 298 S.W.2d 761, 766 (1956); *Hart v. First Nat'l Bank,* 690 S.W.2d 536, 539 (Tenn. Ct. App. 1985)). Most notably, "a principal is responsible for the acts of an agent within is apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of authority, and not where the agent's own conduct has created the apparent authority." *Southern Ry. Co.,* 197 S.W. at 675.

Here, Nursing Home contends that Daughter's participation in handling Decedent's medical matters is proof of a principal/ agent relationship between Decedent and Daughter. As support for its argument, Nursing Home argues that Daughter made medical decisions with the doctors during Decedent's hospital stay in 2004, signed paperwork admitting Decedent to another nursing home prior to Decedent's admittance to Defendant Nursing Home, met with Mr. Wells, and signed Nursing Home's admissions paperwork. At her deposition, Daughter testified that: Daughter told Mr. Wells that she did not have "Power of Attorney" for her mother, Daughter's aunt and uncle made the decision to admit Decedent to Nursing Home because the uncle's daughter worked there; Daughter knew only one of Decedent's doctors, and was not familiar with Decedent's other doctors; Daughter did not know of any significant event in 2004

where her mother, Decedent, relied on Daughter's assistance; and Daughter did not sign checks for Decedent, sell or buy property for Decedent, obtain a residence for Decedent, acquire government aid for Decedent, secure insurance for Decedent, or acquire or dispose of property for Decedent prior to Decedent's admission to Nursing Home.

Daughter was not appointed to be Decedent's attorney-in-fact until May 11, 2005, five (5) months after Decedent's admission to Nursing Home. Additionally, the Power of Attorney document does not vest Daughter with power to make health care decisions, sign contracts on Decedent's behalf, or waive Decedent's constitutional rights. Rather, the Power of Attorney document vests Daughter with the "full power and authority over [Decedent's] property, real and personal." Further, our review of the record reveals that, at the time of admission to Nursing Home, Decedent had not been informed by anyone, including her family, that she was being admitted to a nursing home. At the time of admission, Nursing Home concedes that Decedent was a mentally competent person at all relevant times; however, Nursing Home never asked Decedent if she wanted to sign the Admissions paperwork or review the instruments thereafter.

We find the *Raiteri* case to be applicable to our decision. *Raiteri ex rel Cox v. NHC Healthcare/Knoxville, Inc.*, No. E2003-00068-COA-R9-CV, 2003 WL 23094413, at *1 (Tenn. Ct. App. Dec. 30, 2003)(*no perm. app. filed*). In *Raiteri*, Mr. Cox met with the nursing home's admissions coordinator to make arrangements for his wife's admission so that Mrs. Cox could receive physical therapy and vocational rehabilitation services. At the meeting, Mr. Cox was asked to sign the nursing home's "Admission and Financial Contract" on his wife's behalf, although his wife was not mentally incompetent. After discussing the enforceability of the contract, the court stated:

> [W]e conclude that the evidence before us preponderates against the trial court's implicit decision that Mr. Cox had authority to sign the admission agreement on behalf of his wife. There is absolutely no evidence that he had her express authority to sign for her. We also hold that the defendant cannot rely upon the concept of apparent authority. The evidence reflects that Mrs. Cox had her mental faculties, was "sharper" than her husband, and was otherwise in a position to indicate whether she assented to the terms of these significant contract provisions. The record is also devoid of any exigent circumstances that would clothe Mr. Cox with apparent authority to bind his wife to the admission agreement, particularly the alternative dispute resolution provisions. We certainly find nothing in the record before us, either factually or legally, warranting a holding that Mr. Cox had the right to waive his wife's very valuable constitutional right to a jury trial to adjudicate her rights in this matter. As the admissions coordinator acknowledged, Mrs. Cox "was capable of understanding" the admission agreement. The admissions coordinator did not adequately explain why she did not insist upon Mrs. Cox signing the admission agreement, or, at a minimum, why she did not ask Mrs. Cox to ratify what her husband had purported to do on her behalf.

In summary, we hold that Mr. Cox did not have the actual or apparent authority to bind Mrs. Cox to the alternative dispute resolution provisions in the admission agreement. Furthermore, these provisions, especially the waiver of the right to a jury trial, are outside the reasonable expectations of a reasonable consumer, and, hence, unenforceable. Following *Eyring* and *Howell,* we hold that the trial court erred when it decreed that the mediation and arbitration terms were enforceable. Therefore, we conclude that the judgment below must be reversed.

*Raiteri*, 2003 WL 230994413, at *9.

Since *Raiteri*, other Tennessee cases have followed similar rationale, finding authority if given expressly, either through oral expression or via a Power of Attorney document, and finding no authority if the principal did not exhibit some sort of act to convey the authority. *See Owens v. Nat'l Health Corp.*, No. M2005-01272-SC-R11-CV, 2007 WL 3284669, at *15-20 (Tenn. Nov. 8, 2007)(*Petition to Rehear granted* Feb. 7, 2008)(holding that the power of attorney document authorized the attorney-in-fact to enter into the arbitration agreement on behalf of the principal); *Necessary v. LifeCare Ctrs. of Am., Inc.*, No. E2006-00453-COA-R3-CV, 2007 WL 3446636, at *3-4 (Tenn. Ct. App. Nov. 16, 2007) (*no perm. app. filed*) (holding that because Plaintiff had express authority to sign all of the admission documents, she also had authority to sign the arbitration agreements on the Decedent's behalf as one of those admission documents); *but see Hendrix v. LifeCare Ctrs. of Am., Inc.*, No. E2006-02288-COA-R3-CV, 2007 WL 4532876, at * 14 (Tenn. Ct. App. Dec. 21, 2007) (*no perm. app. filed*) (holding that Durable Power of Attorney was not effective at time of Mother's admission because Mother was still able to make her own medical decisions at the time of admission, thus, Daughter's waiving of Mother's right to jury trial was unenforceable).

Based on the record before us and the trial court's findings of fact, we conclude that no actual or apparent agency relationship existed between Decedent and Daughter. Although Daughter assisted Decedent in being admitted to both nursing care facilities, her involvement in most aspects of the Decedent's life was quite limited, as Decedent managed her own personal affairs. No Power of Attorney existed at the time Daughter signed the Admissions Agreement, and she did not purport to be Decedent's attorney-in-fact. Regardless of the extent of Daughter's involvement in Decedent's personal matters, Nursing Home simply cites no single action by the *Decedent* where she indicated to Nursing Home or to Daughter that Daughter was her agent for the purpose in question. *See Necessary*, 2007 WL 3446636, at *3-4.

### *Ratification*

Nursing Home also argues that, regardless of whether Daughter had authority to bind Decedent to the Arbitration Agreement, Decedent ratified the contracts signed by Daughter through her inaction. In Tennessee, it is well-settled that, "where a party with *full knowledge* of the facts involving him in liability acquiesces in what has been done, he thereby sanctions it; and

silence and inaction on his part in such a case, after a reasonable time, will amount to a ratification, and make him liable." *Fite v. Wiel*, 46 S.W. 330, 334 (Tenn. Ct. App. 1898) (quoting *Winham v. Crutcher*, 78 Tenn. 610, 615 (1882)) (emphasis added). Generally, "full knowledge" requires knowledge "of all material facts and circumstances relative to the unauthorized act or transaction." *Monumental Life Ins. Co. v. Puckett*, No. W2005-00083-COA-R3-CV, 2006 WL 44037, at *3 (Tenn. Ct. App. Jan. 9, 2006), *perm. app. denied* (Tenn. Aug. 21, 2006), (quoting *Gough v. Ins. Co. of N. Am.,* 157 Tenn. 546, 549-50 (1928)).

Nursing Home contends that, after Daughter signed the Admission Agreement, including the Arbitration Agreement, she told her mother that she had signed these instruments. Nursing Home argues that Decedent's failure to protest, dissent, or otherwise disaffirm her daughter's acts constitutes ratification. Defendants rely on the following testimony from Daughter's deposition to establish ratification:

> Q. . . . [d]id she ever object or - - or somehow communicate her disapproval of your signing the Admission Agreement or the Arbitration Agreement on her behalf.
>
> . . . .
>
> A. Uh-uh.
>
> Q. Okay. Did you ever consult your mother - - or did you ever notify her or tell her that you signed the Arbitration Agreement or the Admission Agreement?
>
> A. Yes.
>
> Q. Okay. And at that time, did she say something to the effect that you should not have signed those?
>
> A. No.
>
> Q. Did your mother, as far as you could tell, want to be at Allenbrooke?
>
> A. No.
>
> Q. Did she ever tell you that she wanted to leave the facility and go elsewhere?
>
> A. No.

We are hard-pressed to find that this or any other portion of Daughter's testimony shows that Decedent had full knowledge of all material facts and circumstances related to Daughter signing the admission instruments. The material terms of the transaction are not discussed, the circumstances of the signing are not set forth, and nothing indicates when this discussion took place. Additionally, Daughter's testimony reveals that she understood very little of what Admission Agreement and Arbitration Agreement provisions contained. We do not find that the evidence presented rises to the level of "full knowledge" as set out in *Puckett. Id*. at *3. Accordingly, we find that the trial court did not err by finding that no ratification occurred under these facts.

### Mutual Assent

Nursing Home raises one final issue of whether Decedent's continuation of residing at and using Nursing Home's services indicates her assent to the Arbitration Agreement. Specifically, Nursing Home argues that the Admission Agreement required Decedent to pay for the services received from her own funds or through Medicaid and Medicare payments. Daughter executed the forms in the Admissions Agreement necessary to obtain the Medicaid and Medicare payments, and Decedent received the benefits of healthcare and a residence from Nursing Home. Accordingly, Nursing Home argues, Decedent manifested her assent to the Admission Agreement.

According to basic contract principles, a "contract 'must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced.' " *Reno v. SunTrust, Inc.,* No. E2006-01641-COA-R3-CV, 2007 WL 907256, at *4 (Tenn. Ct. App. Mar. 26, 2007) (*no perm. app. filed*) (quoting *Doe v. HCA Health Servs. of Tenn., Inc.,* 46 S.W.3d 191, 196 (Tenn. 2001) (citations omitted)). We have already held that Daughter did not have the authority to sign the Arbitration Agreement on Decedent's behalf, and that, because Decedent did not have knowledge of the material facts and circumstances surrounding the instrument, she did not ratify the Arbitration Agreement by her inaction. Accordingly, we cannot find that Decedent manifested assent to Daughter's contracting on her behalf. Due to our decision regarding the agency, ratification, and mutual assent issues, all other issues are pretermitted.

### Conclusion

For the foregoing reasons, we affirm the judgment of the trial court. Costs of this appeal are assessed to the Appellants, Allenbrooke Nursing and Rehabilitation Center, LLC, Allenbrooke Health Care Center, Allenbrooke Health Care Center d/b/a/ Beverly Enterprises-Tennessee, Inc., and Beverly Enterprises Tennessee, Inc., and their surety.

_____
DAVID R. FARMER, JUDGE